UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CINSIA CIOLINO and ALFONSO CIOLINO, | * * * | |
| Plaintiffs, | * * | |
| v. | * * | Civil Action No. 13-cv-13300-ADB |
| AARON EASTMAN, et al., | * * | |
| Defendants. | * | |

## MEMORANDUM & ORDER
## ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

BURROUGHS, D.J.

## I.    INTRODUCTION

On the evening of June 30, 2013, while attending the annual St. Peter's Festival in

Gloucester, Massachusetts, Plaintiff Alfonso Ciolino ("Mr. Ciolino") was arrested by officers of

the Essex County Sheriff's Department and the Gloucester Police Department. Mr. Ciolino,

along with his wife Cinsia Ciolino ("Mrs. Ciolino"), filed this civil action asserting various

federal and state-law claims against the arresting officers, the Sheriff of Essex County, and the

City of Gloucester. Plaintiffs allege that the arresting officers used excessive force during Mr.

Ciolino's arrest, in violation of his constitutional rights, and that they conspired to provide false

information to the Gloucester Police Department, resulting in criminal charges against Mr.

Ciolino. Currently before the Court is a Motion for Summary Judgment filed by defendants

Aaron Eastman, David Earle, and George Gikas, all of whom are officers of the Essex County

Sheriff's Department, and Frank Cousins, Jr., Sheriff of Essex County ("Cousins"). For the

reasons set forth herein, defendants' Motion is <u>ALLOWED IN PART</u> and <u>DENIED IN PART</u>.

## II.      FACTUAL AND PROCEDURAL BACKGROUND

### A.  Procedural History

Plaintiffs Alfonso and Cinsia Ciolino ("Plaintiffs") filed their original Complaint on December 31, 2013, naming the City of Gloucester, Gloucester Police Officer Brian Crowley, Essex County Sheriff Frank Cousins, Jr., and an unnamed member of the Essex County Sheriff's Department as defendants [ECF No. 1]. Plaintiffs filed an Amended Complaint on July 31, 2014 [ECF No. 29], which named Essex County Sheriff's Department officers Aaron Eastman, David Earle, and George Gikas as additional defendants. On October 8, 2014, Plaintiffs voluntarily dismissed defendant Crowley [ECF No. 38], and on November 11, 2014, they voluntarily dismissed the City of Gloucester [ECF No. 45]. In February 2015, the remaining defendants (Sheriff Cousins, and Officers Eastman, Earle, and Gikas) moved for summary judgment on all claims alleged in Plaintiffs' Amended Complaint [ECF No. 58]. Their Motion was accompanied by a Memorandum of Law [ECF No. 59], and a Statement of Material Facts pursuant to Local Rule 56.1 [ECF No. 60].

On April 6, 2015, Plaintiffs filed their Opposition to Defendants' Motion for Summary Judgment [ECF No. 66], along with a Counter-Statement of Material Facts pursuant to Local Rule 56.1 [ECF No. 65]. Plaintiffs do not oppose the Motion for Summary Judgment with respect to defendant Cousins, who was not involved in Mr. Ciolino's arrest. [ECF No. 6, 1] Plaintiffs argue that summary judgment is not warranted as to defendants Eastman, Earle, and Gikas (collectively, "Defendants"), each of whom personally participated in Mr. Ciolino's arrest.

### B.  Factual Background

The following facts are undisputed, unless otherwise noted. Additional relevant facts will be discussed as needed in this Memorandum.

On June 30, 2013, the Plaintiffs arrived for dinner at Mrs. Ciolino's mother's home at approximately 8pm [Defendants' Rule 56.1 Statement of Undisputed Material Facts ("Def. Facts") ¶ 1, ECF No. 60]. Each of them drank two beers with dinner, and they subsequently drove to the St. Peter's Festival in Gloucester [Id. ¶¶ 2-4]. At approximately 11:30pm, Plaintiffs left a nearby café with their friends Vincent and Lillian LoGrasso [Id. ¶¶ 5-6]. Mr. Ciolino and Mr. LoGrasso went to the St. Peter's Club, where Mr. Ciolino is a member, to use the restroom [Id. ¶ 6; see Deposition of Alfonso Ciolino, ECF No. 60-4 ("A. Ciolino Dep.") at 16:5-10].[1]

When Mr. Ciolino and Mr. LoGrasso exited the St. Peter's Club, law enforcement officers and K-9 dogs from the Essex County Sheriff's Department and the Gloucester Police Department were present in the area surrounding the club [Def. Facts ¶ 10]. Defendant George Gikas, a Sergeant of the Essex County Sheriff's Department ("Sergeant Gikas"), was assigned to K-9 duty the night of June 30th [Id. ¶ 21]. Defendant officers Eastman and Earle, who are also employed by the Essex County Sheriff, were assigned to plainclothes duty [Id. ¶ 26]. All three officers were standing in the area outside the St. Peter's Club when Mr. Ciolino exited. Upon leaving the club, Mr. Ciolino noticed the law enforcement officers and the K-9 dogs, and he testified during his deposition that they appeared to be "ready to kick everybody out." [A. Ciolino Dep. at 16:10-11].

The parties disagree about the size of the crowd outside the St. Peter's Club on the night of June 30th. Although Officer Eastman and Sergeant Gikas testified that there were approximately 200-250 people in the area [see Def. Facts ¶ 8; Deposition of Aaron Eastman, ECF No. 60-6 ("Eastman Dep.") at 9:23-24; Deposition of George Gikas, ECF No. 60-5 ("Gikas

---

[1] Mr. Ciolino testified that he was only inside the club for a couple of minutes, and that he did not consume any alcohol while inside [A. Ciolino Dep. at 37:2-15].

Dep.") at 12:1], Mr. Ciolino estimated that there were only about 50 people in the crowd [A. Ciolino Dep. at 28:20-22], and Mrs. LoGrasso testified that there were as few as 30 people in the crowd [Deposition of Lillian LoGrasso, ECF No. 65-1 ("L. Lograsso Dep.") at 25:21-22].

The parties also disagree over whether the crowd, and Mr. Ciolino in particular, was compliant with orders to clear the area. Officer Eastman testified that law enforcement officers were continually giving the crowd orders to disperse, and that some in the crowd refused to move [Eastman Dep. at 9:24-10:2; see also ECF No. 60-8 (Gikas Memo dated 7/1/2013)]. Mr. Ciolino testified that he did not hear any law enforcement officer give orders to disperse [A. Ciolino Dep. at 39:2-7]. Mrs. Ciolino testified that she heard no orders to move along or disperse until after her husband had been arrested [Deposition of Cinsia Ciolino ("C. Ciolino Dep"), ECF No. 65-3, at 18:1-11, 21:18-21]. Sergeant Gikas, however, testified that he specifically told Mr. Ciolino to "move along." [Gikas Dep. at 11:21-12:1].

The parties agree that upon encountering the K-9s and officers outside the club, Mr. Ciolino loudly stated "[l]ook, the dog's got a muzzle in their mouth. What's he going to do? The dogs cannot hurt us . . . they have muzzles on." [Def. Facts ¶¶ 16, 20; A. Ciolino Dep., ECF No. 65-2, at 82:1-6]. The parties further agree that Mr. Ciolino made a gesture with his arm while saying this [A. Ciolino Dep., ECF No. 60-4, at 76:9-13]. Defendants, however, characterize Mr. Ciolino's actions as "taunting" the K-9 dogs, waving his hands within two feet of the dogs' faces [Eastman Dep. at 11:13-14]. Sergeant Gikas testified that Mr. Ciolino was "yelling," and "lunging" at his dog, "aggravating," "teasing," and "taunting" it [Gikas Dep. at 12:3-14]. Officer Eastman also testified that he observed Mr. Ciolino inciting the crowd, by yelling to the crowd, turning towards the dogs, and then turning back towards the crowd, with his hands "animated" and "up in the air." [Eastman Dep. at 14:21-24]. Mr. Ciolino denies taunting the dogs or inciting

4

the crowd [A. Ciolino Dep. at 82-84], and other witnesses to the events provided affidavits stating that they never saw Mr. Ciolino threaten, lunge at, or make any other sudden movements towards the K-9s or officers [See Affidavit of Peter Giordano, ECF No. 65-5, ¶ 11; Affidavit of Sabrina Giordano, ECF No. 65-6, ¶¶ 10-11]. After Mr. Ciolino made the motion or gesture with his hand, Sergeant Gikas approached Mr. Ciolino, grabbed him by the shirt collar, and pulled him down to the ground to place him under arrest for allegedly disturbing the peace and disorderly conduct [Def. Facts ¶ 32].

The record contains a 23-second video recording of Mr. Ciolino's arrest, which appears to have been taken from a camera or camera phone in a building above street level [Video of the Incident ("Video"), ECF No. 60-10].[2] The video footage shows a group of approximately 15 people gathered behind a street barrier, in a sidewalk area. It is not clear whether the video captures the entire crowd, or only a small portion of it. Some people in the crowd appear to be moving along the sidewalk, and some are stationary. Sergeant Gikas can be observed standing in the street, facing the crowd with his K-9 dog, approximately six feet away from the sidewalk. Another officer and a second K-9 dog are standing in front of Sergeant Gikas, within two feet of the people on the sidewalk. Officers Eastman and Earle, both in plainclothes, are standing in the street behind Gikas, also facing the crowd. Both K-9 dogs are barking continuously in the direction of the crowd, but the video and audio are not clear enough to determine whether the law enforcement officers are speaking or giving commands.

In the video, Mr. Ciolino walks on the sidewalk, approximately two to three feet away from the second officer and his K-9 dog, and approximately eight to ten feet away from Sergeant

_____

[2] It is not clear who recorded the video footage or how the parties obtained it.

Gikas and his K-9. Mr. Ciolino pauses in front of the second officer's dog, and then lifts out his arm, which appears to come within a foot or two of the dog's head. Mr. Ciolino then turns around, with his back towards the officers.[3] The second officer does not immediately react. Sergeant Gikas, however, takes several steps towards Mr. Ciolino, grabs him by the shirt collar, and, with one hand, pulls Mr. Ciolino's body backwards into the street and down onto the pavement. Mr. Ciolino falls on his side. As he falls, Officers Eastman and Earle approach. Each of them grabs one of Mr. Ciolino's arms, briefly lifting him up before pushing him back down to the ground on his stomach. With Mr. Ciolino still on the ground, they pull his arms behind his back and place him in handcuffs. The video ends with Mr. Ciolino lying face-down on the pavement.

Mr. Ciolino was subsequently transported to the Gloucester Police Department and charged with a municipal ordinance violation and disorderly conduct. Those charges, however, have since been dismissed by the Gloucester District Court [Def. Facts ¶ 42].

Mr. Ciolino alleges that Gikas, Eastman, and Earle used excessive force during his arrest, resulting in physical injuries to Mr. Ciolino's rotator cuff, neck, and elbow, which required him to have rotator cuff surgery in September 2013. Although he was previously employed as a mason, Mr. Ciolino alleges that the injuries he sustained on June 30, 2013 have prevented him from working and, further, that he sustained great emotional distress as a result of the incident. Mrs. Ciolino also alleges that she suffered great emotional distress from witnessing the incident.

---

[3] The audio does not reveal whether Mr. Ciolino says anything to the dogs, the officers, or the crowd.

### C. Claims for Relief

Plaintiffs' Amended Complaint alleges the following remaining claims for relief against Defendants Eastman, Earle and Gikas: Count One asserts a 42 U.S.C. § 1983 claim on the grounds that Defendants violated Mr. Ciolino's Fourth Amendment rights by using excessive force during his arrest. Count Four alleges that Defendants conspired to deprive Mr. Ciolino of his constitutional rights, in violation of 42 U.S.C. § 1983. Count Six alleges a state-law claim for malicious prosecution. Counts Eight and Nine allege that the Defendants are liable to Mr. and Mrs. Ciolino, respectively, for intentional infliction of emotional distress. Count Ten alleges that Defendants further violated Mr. and Mrs. Ciolino's rights pursuant to the Massachusetts Civil Rights Act, M.G.L. c. 12, §11I. [4]

## III.   DISCUSSION

### A. Legal Standard

Summary judgment is appropriate where the movant can show that "there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). "A fact is material if its resolution might affect the outcome of the case under the controlling law." Cochran v. Quest Software, Inc., 328 F.3d 1, 6 (1st Cir. 2003) (citation omitted). "A genuine issue exists as to such a fact if there is evidence from which a reasonable trier could decide the fact either way." Id. (citation omitted).

---

[4] Count Two alleges a derivative Section 1983 claim against defendant Cousins, as Sheriff of Essex County, on the theory that he is vicariously liable for the officers' alleged misconduct. Plaintiffs do not oppose the Motion for Summary Judgment as to Sheriff Cousins. Therefore, judgment in favor of Defendant Cousins will enter as to Count Two. In addition, to the extent that Count Four and Count Ten allege any claims against Defendant Cousins, summary judgment will also enter for Cousins on those counts. Counts Three, Five, and Seven alleged claims against the City of Gloucester and/or Officer Brian Crowley, who have already been dismissed from this case.

"To succeed in showing that there is no genuine dispute of material fact," the moving party must point to "specific evidence in the record that would be admissible at trial." Ocasio-Hernandez v. Fortuño-Burset, 777 F.3d 1, 4-5 (1st Cir. 2015). "That is, it must 'affirmatively produce evidence that negates an essential element of the non-moving party's claim,' or, using 'evidentiary materials already on file ... demonstrate that the non-moving party will be unable to carry its burden of persuasion at trial.'" Id. (quoting Carmona v. Toledo, 215 F.3d 124, 132 (1st Cir. 2000)). "One of the principal purposes of the summary judgment rule is to isolate and dispose of factually unsupported claims or defenses . . . ." Celotex Corp. v. Catrett, 477 U.S. 317, 323-24 (1986). Once the movant takes the position that the record fails to make out any trialworthy question of material fact, "it is the burden of the nonmoving party to proffer facts sufficient to rebut the movant's assertions." Nansamba v. North Shore Med. Ctr., Inc., 727 F.3d 33, 40 (1st Cir. 2013) (citation omitted).

In reviewing the record, however, the court "must take the evidence in the light most flattering to the party opposing summary judgment, indulging all reasonable inferences in that party's favor." Cochran, 328 F.3d at 6 (citation omitted).  The First Circuit has noted that this standard "is favorable to the nonmoving party, but it does not give him a free pass to trial." Hannon v. Beard, 645 F.3d 45, 48 (1st Cir.2011). "The factual conflicts upon which he relies must be both genuine and material," Gomez v. Stop & Shop Supermarket Co., 670 F.3d 395, 396-97 (1st Cir. 2012), and the court may discount "conclusory allegations, improbable inferences, and unsupported speculation." Cochran, 328 F.3d at 6 (quoting Medina-Munoz v. R.J. Reynolds Tobacco Co., 896 F.2d 5, 8 (1st Cir. 1990)).  "If the evidence is merely colorable, or is not significantly probative, summary judgment may be granted." Medina-Munoz, 896 F.2d at 8.

8

### B.  Analysis

### 1. Count One: Qualified Immunity

Count One of the Amended Complaint states a cause of action under 42 U.S.C. § 1983, on the ground that Defendants Eastman, Earle and Gikas violated Mr. Ciolino's Fourth Amendment rights by using excessive force during his arrest [See Amended Complaint, ECF No. 29 ¶¶ 35-39; Plaintiffs' Opposition, ECF No. 66 p. 3]. Defendants argue that summary judgment is warranted because they are shielded by the protections of qualified immunity. [5]

"Qualified immunity is a doctrine that shields government officials performing discretionary functions from liability for civil damages 'insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Estate of Bennett v. Wainwright, 548 F.3d 155, 167 (1st Cir. 2008) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). Determining whether a defendant is entitled to qualified immunity requires a two-prong analysis. Fernandez-Salicrup v. Figueroa-Sancha, 790 F.3d 312, 325 (1st Cir. 2015). "First, we must decide whether the facts alleged or shown by the plaintiff make out a violation of a constitutional right." Id. (internal quotations and citation omitted).

---

[5] Section 1983 is "not itself a source of substantive rights, but merely provides a method for vindicating federal rights elsewhere conferred." Graham v. Connor, 490 U.S. 386, 393-94 (1989) (internal quotations and citation omitted). It provides in relevant part that "[e]very person who, under color of any statute, ordinance, regulation, custom, or usage, of any State or Territory or the District of Columbia, subjects, or causes to be subjected, any citizen of the United States or other person within the jurisdiction thereof to the deprivation of any rights, privileges, or immunities secured by the Constitution and laws, shall be liable to the party injured in an action at law, suit in equity, or other proper proceeding for redress . . . ." 42 U.S.C. § 1983. There is no dispute that Defendants were acting under color of state law when they arrested Mr. Ciolino. But Defendants take the position they did not violate Mr. Ciolino's Fourth Amendment rights because the force they used during his arrest was reasonable and necessary under the circumstances. Their motion for summary judgment, however, is premised on the defense of qualified immunity, pursuant to which Defendants would be insulated from liability under Section 1983 even assuming Mr. Ciolino's constitutional rights were violated.

"Second, assuming a constitutional violation exists, we determine 'whether the right was "clearly established" at the time of the defendant's alleged violation.'" Id. (quoting Gilk v. Cunniffe, 655 F.3d 78, 81 (1st Cir. 2011)). In this case, the Court finds that there are genuine disputes of material fact as to both prongs of the qualified immunity test, and that these disputes preclude summary judgment for the Defendants.

### a. First Prong: Fourth Amendment Violation

In assessing qualified immunity, the court must first determine whether the plaintiff's constitutional rights were violated. "A claim that the police used excessive force in making an arrest must be analyzed in light of the Fourth Amendment's prohibition of unreasonable searches and seizures." Gaudreault v. Municipality of Salem, Mass., 923 F.2d 203, 205 (1st Cir. 1990). "The pertinent question is whether the force used was 'objectively reasonable' under all the circumstances; that is, whether it was consistent with the amount of force that a reasonable police officer would think necessary to bring the arrestee into custody." Id. In determining whether the force used was objectively reasonable, relevant factors include "the severity of the crime, whether the suspect posed an immediate threat to the safety of the officers or others, and whether he was actively resisting arrest or attempting to evade arrest by flight." Id. (citing Graham v. Connor, 490 U.S. 386, 396 (1989)). Further, because the standard is one of "objective" reasonableness, the court may not consider an officer's subjective intent or motivation. Raiche v. Pietroski, 623 F.3d 30, 36 (1st Cir. 2010).

Here, the parties dispute several key facts that bear on the objective reasonableness of Defendants' use of force in arresting Mr. Ciolino. First, they disagree about the size and behavior of the crowd outside the St. Peter's Club at the time of the arrest. Although Plaintiffs and other eyewitnesses testified that there were as few as 30-50 people in the crowd, the defendant officers reported that there were upwards of 200 people that refused to clear the area. The parties also

disagree as to whether the defendant officers were giving the crowd and Mr. Ciolino orders to disperse. There is some evidence to support both versions of events, and the video footage of the arrest is not conclusive. The parties further dispute whether Mr. Ciolino was "taunting" the K-9 dogs and inciting the crowd outside the St. Peter's Club. The video footage confirms that Mr. Ciolino made at least one motion with his arm in the direction of a K-9 dog, which immediately precipitated his arrest, but the video does not reveal what Mr. Ciolino was doing in the minutes just prior to his arrest, nor is there sufficient audio to determine whether he spoke, or what he said. The Defendants testified that they observed Mr. Ciolino on the sidewalk, yelling at the dogs, and then turning towards the crowd with his hands in the air. Eastman testified that Mr. Ciolino approached the K-9s "several times." Because the video footage is abbreviated, it is not conclusive on these points. Mr. Ciolino and other witnesses, however, deny that Mr. Ciolino was inciting the dogs or the crowd.

These disputed facts, which must be resolved by a jury, are critical to determining whether the Defendants' use of force in arresting Mr. Ciolino was objectively reasonable. Therefore, at this juncture, the Court cannot rule as a matter of law that there was no Fourth-Amendment violation. "In a case in which the parties offer diametrically opposite versions of the facts, each founded on first-hand knowledge, we must ask whether the account propounded by the nonmovant suffices to thwart the swing of the summary judgment ax." Morelli v. Webster, 552 F.3d 12, 18 (1st Cir. 2009). The Court concludes that in this case, Plaintiffs have raised a trial-worthy dispute over whether the officers' use of force against Mr. Ciolino was objectively reasonable under the circumstances.

Defendants' Motion for Summary Judgment relies on their own version of the facts, including that Mr. Ciolino was "noncompliant" with officers' orders to disperse; that Mr. Ciolino

"got in the face of" and was "lunging" at the K-9s and their handlers; and that there were 200-250 people in an unruly crowd surrounding the club [ECF No. 59 pp. 6-7]. Defendants argue that in light of these facts, it was not objectively unreasonable to perform a take-down maneuver on Mr. Ciolino. The Court, however, cannot simply accept the movant's characterization of disputed facts on a motion for summary judgment, particularly when a contemporaneous video and Plaintiffs' account allow for a different conclusion. See Bettencourt v. Arruda, No. CIV.A. 10-11487-JGD, 2012 WL 5398475, at *9 (D. Mass. Nov. 1, 2012) (noting that defendants' reliance on "their own version of events to establish the reasonableness of [the officer's] actions is unpersuasive in light of this court's obligation to view the record in favor of the plaintiff").

Here, viewing the record in the light most favorable to Plaintiffs, there is sufficient evidence from which a reasonable jury could conclude that Mr. Ciolino did not ignore any orders to disperse; that he was not, in fact, "taunting" the K-9 dogs or inciting the crowd; and that he did not attempt to flee or resist arrest. Such findings could support a conclusion that the Defendants used excessive force by taking Mr. Ciolino down to the ground and handcuffing him with force sufficient to injure his rotator cuff. See Raiche, 623 F.3d at 37 (fact that plaintiff remained seated on his motorcycle and did not attempt to flee supported jury's finding that police officer's tackling plaintiff to the ground was objectively unreasonable). Consequently, Count One of Plaintiffs' Amended Complaint rights will not be dismissed on summary judgment. See Titus v. Town of Nantucket, 840 F. Supp. 2d 404, 414 (D. Mass. 2011) (noting that if plaintiff "did not pose any threat to the safety of the officers or others . . .did not resist arrest, and . . . did not attempt to flee," defendants' use of anything more than "very minimal force" could be judged objectively unreasonable).

**b. Second Prong: Clearly Established Right**

The disputes of fact discussed above also preclude the Court from finding that the constitutional rights allegedly violated were not "clearly established," such that Defendants would be entitled to qualified immunity on the second prong of the test. In determining whether a constitutional right is "clearly established," the Court must conduct two distinct inquiries: "[first], whether the contours of the right, in general, were sufficiently clear, and [second] whether, under the specific facts of the case, a reasonable defendant would have understood that he was violating the right." Ford v. Bender, 768 F.3d 15, 23 (1st Cir. 2014) (citing Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)).

With regard to the first question, Defendants do not dispute that the Fourth Amendment right to be free from unlawful searches and seizures—which includes the right to be free from excessive force during arrest—is clear and well-established. The Supreme Court set forth those governing principles in Graham v. Connor, 490 U.S. 386 (1989), and there is ample First Circuit authority interpreting and applying these principles in excessive force cases. Rather, Defendants argue that the relevant inquiry is the second one, namely, "whether Mr. Ciolino had a clearly established right not to be taken down to the ground, *given the circumstances as they were* in the course of him being placed under arrest." [ECF No. 59] (emphasis added). Although the Court agrees that the second question controls, it does not agree that this question can be answered on summary judgment.

"The ultimate question of whether a reasonable police officer, on the basis of information known to him, could have believed his actions were in accord with constitutional rights is a question of law, subject to resolution by the judge not the jury." St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1 (1st Cir. 1995) (citation omitted). But where, as here, "there is a factual dispute, that factual dispute must be resolved by a fact finder." Id. Assuming Plaintiffs' version of the

facts, which is supported by some evidence of record, Mr. Ciolino's conduct on the night of June

30th did not suggest that he posed any threat to the officers, the K-9 dogs, or the public. And if a

jury were to accept Plaintiffs' version of the facts *in toto*, Defendants would not be entitled to

qualified immunity on the excessive force claim. "The use of violence against individuals who

pose no safety threat is clearly unreasonable, and that fact would have been understood by an

objectively reasonable officer." Goddard v. Kelley, 629 F. Supp. 2d 115, 128 (D. Mass. 2009);

see also Asociacion de Periodistas de Puerto Rico v. Mueller, 529 F.3d 52, 62 (1st Cir. 2008)

("[E]ven if a reasonable officer would have believed it appropriate to use pepper spray in

response to an unruly mob, applying pepper spray into the face of an unthreatening journalist

lying on the ground might well not be protected under the mantle of qualified immunity.");

Morelli, 552 F.3d at 24 (qualified immunity would be unavailable, where the facts, "seen through

the prism of the plaintiff's account, simply do not justify yanking the arm of an unarmed and

non-violent person, suspected only of the theft of $20, and pinning her against a wall for three to

four minutes with sufficient force to tear her rotator cuff"); Jacobson v. City of Nashua, No. CIV.

01-165-B, 2002 WL 1349515, at *4 (D.N.H. June 19, 2002) ("[T]he use of such force on a

person sitting passively who complies immediately with a command to show his hands—and

who is not reasonably thought to be armed—is unreasonable.").

     Viewing the facts in the light most favorable to Plaintiffs, Sergeant Gikas' decision to

execute a "take-down" on Mr. Ciolino and forcibly pull his body down to the pavement could be

found to be an objectively unreasonable use of force on a non-threatening, compliant individual.

Similarly, Officers Eastman and Earle's actions of pulling Mr. Ciolino up by his arms, and then

pushing him back down to the pavement in order to handcuff him, could also be found to

constitute excessive force. Where, as here,  there are disputes of fact regarding the circumstances

surrounding Mr. Ciolino's arrest, the Court cannot determine as a matter of law whether a reasonable officer in Defendants' shoes would have understood that he was violating Mr. Ciolino's Fourth Amendment rights.

Thus, Defendants' Motion for Summary Judgment is hereby <u>DENIED</u> as to Count One of the Amended Complaint, and the issue of qualified immunity will be deferred until key factual disputes are resolved at trial. See <u>Kelley v. LaForce</u>, 288 F.3d 1, 7 (1st Cir. 2002) (recognizing that pre-trial resolution of the qualified immunity question "sometimes will be impossible because of a dispute as to material facts"); <u>Kimberley v. Searle</u>, No. CIV.A. 92-11556-Z, 1993 WL 343672, at *5 (D. Mass. Aug. 24, 1993) (denying motion for summary judgment as to qualified immunity on excessive force claim, where officer applied "take down" maneuver that allegedly broke plaintiff's arm, but there were "factual disputes as to whether plaintiff resisted arrest and whether [the officer] used only that amount of force reasonably necessary to subdue him").

### 2. Count Four: Section 1983 Conspiracy Claim

"A civil rights conspiracy is commonly defined is a combination of two or more persons acting in concert to commit an unlawful act, or to commit a lawful act by unlawful means, the principal element of which is an agreement between the parties to inflict a wrong against or injury upon another, and an overt act that results in damages." <u>Earle v. Benoit</u>, 850 F.2d 836, 844 (1st Cir. 1988) (internal quotations and citation omitted). For such a conspiracy to be actionable under Section 1983, however, a plaintiff must prove that there has been, in addition to the conspiratorial agreement, "an actual deprivation of a right secured by the Constitution and laws." <u>Santiago v. Fenton</u>, 891 F.2d 373, 389 (1st Cir. 1989) (quoting <u>Earle</u>, 850 F.2d at 844).

Here, Plaintiffs' claim for conspiracy to violate Section 1983 is based on the allegation that the defendant officers "conspired to invent a crime and then prosecute to cover up their

misconduct." [ECF No. 66 p. 15]. After Mr. Ciolino was arrested, he was charged with a municipal ordinance violation and disorderly conduct [Def. Facts ¶ 19].[6] Plaintiffs note that although the police report associated with Mr. Ciolino's arrest was authored by Officer Brian Crowley of the Gloucester Police Department, Officer Crowley did not actually witness the arrest. [Deposition of Brian Crowley, ECF No. 65-8 ("Crowley Dep."), 62:1-64:24]. Officer Crowley testified at his deposition that his commanding officer instructed him to write up the report, despite the fact that Crowley didn't know what had happened. After Crowley objected, his commanding officer told him to speak with two plainclothes officers from the Essex County Sheriff's Department, who had witnessed the arrest.[7] After doing so, Crowley wrote up the arrest report based on his conversation with those officers [Id. at 62:1-64:24].

Plaintiffs contend that the report [ECF No. 60-9] contains false information about what happened on the night of June 30. Specifically, Officer Crowley states in the report that he was present outside the St. Peter's Club on June 30, 2015, where he was "clearing the crowds away from the bar area," along with other officers and K-9 units. He states that "we asked Mr. Alfonso Ciolino . . . to leave the area on at least 4 occasions in which he refused to comply to our commands." [Id.]. Officer Crowley admitted during his deposition, however, that he did not witness Mr. Ciolino's arrest [Crowley Dep. at 62:1-22]. Plaintiffs further dispute that Mr. Ciolino refused to comply with law enforcements' orders, as stated in the report.

Essentially, Plaintiffs claim that the Defendants conspired to fabricate facts in an attempt to justify Mr. Ciolino's arrest and detention, and to substantiate the charges brought against

---

[6] These charges were later dismissed by the Gloucester District Court [Def. Facts ¶ 26].

[7] It is not clear whether Officer Crowley spoke with Earle, Eastman, and/or Gikas specifically, as he could not identify anyone by name.

him.[8] In Hernandez-Cuevas v. Taylor, 723 F.3d 91, 100 (1st Cir. 2013), the First Circuit held

that the Fourth Amendment provides protection against malicious prosecution, and that a

plaintiff may establish a Fourth-Amendment violation (and thus a Section 1983 claim) if he

proves that "the defendant (1) caused (2) a seizure of the plaintiff pursuant to legal process

unsupported by probable cause, and (3) criminal proceedings terminated in plaintiff's favor." 723

F.3d at 101 (internal quotations and citation omitted).

Because there are remaining factual disputes surrounding the circumstances of Mr.

Ciolino's arrest, the Court cannot determine whether there was probable cause for his arrest as a

matter of law. Furthermore, Plaintiffs have come forth with evidence from which a jury could

reasonably infer a conspiratorial agreement. Officer Crowley testified that the information in his

report was provided to him by the plainclothes officers from the Essex County Sheriff's office. If

a jury found that information to be false, they could also reasonably find that Defendants

conspired to provide Officer Crowley with false information, with the intent to maliciously

prosecute Mr. Ciolino. Consequently, Defendants' Motion for Summary Judgment on Count

Four is DENIED.

### 3. Count Six: Malicious Prosecution – Massachusetts Law

"Under Massachusetts law, there are three elements of a malicious prosecution claim. A

plaintiff must establish that he was damaged because (1) the defendant commenced an original

action without probable cause, (2) with malice, and (3) [ ] the original action terminated in his

favor." Yacubian v. United States, 750 F.3d 100, 108-09 (1st Cir. 2014) (citing Chervin v.

Travelers Ins. Co., 448 Mass. 95 (2006)).

---

[8]Plaintiffs do not appear to argue, nor is there any evidence to support, a claim that Defendants
Earle, Eastman, and Gikas conspired to violate Mr. Ciolino's rights prior to his arrest.

As a threshold matter, it is undisputed that the original action terminated in Mr. Ciolino's favor. Although Mr. Ciolino was charged with a municipal ordinance violation and disorderly conduct following his arrest, Defendants concede that those charges were later dismissed by the Gloucester District Court [Def. Facts ¶ 42].

Further, although Defendants argue that the record is "devoid of facts" connecting them to Mr. Ciolino's criminal prosecution, that is not entirely accurate. Officer Crowley, who authored the arrest report, testified that he prepared the report based on information provided to him by Essex County Sheriff's Department officers. It is well-established that "a person need not swear out a criminal complaint in order to be held answerable for malicious prosecution." Correllas v. Viveiros, 410 Mass. 314, 318 (1991). "Someone who, in bad faith, provides information to a police officer that results in that officer submitting a complaint against another may also be liable." Goddard, 629 F. Supp. 2d at 130. As discussed above, there are material questions of fact in dispute that bear on whether the Defendants had probable cause to arrest Mr. Ciolino, and whether Defendants (and which defendants) provided accurate information to Officer Crowley. Therefore, Defendants' Motion for Summary Judgment is DENIED as to Count Six of the Amended Complaint.

### 4. Counts Eight and Nine: Intentional Infliction of Emotional Distress

Counts Eight and Nine of the Amended Complaint allege that both Mr. and Mrs. Ciolino suffered extreme emotional distress as a result of Defendants' conduct during Mr. Ciolino's arrest. To establish a claim for intentional infliction of emotional distress ("IIED") under Massachusetts law, Plaintiffs must show that:

> (1) [ ] the defendant intended to inflict emotional distress or that he knew or should have known that emotional distress was the likely result of his conduct; (2) [ ] the conduct was extreme and

> outrageous, was beyond all possible bounds of decency and was
> utterly intolerable in a civilized community; (3) [ ] the actions of
> the defendant were the cause of the plaintiff's distress; and (4) [ ]
> the emotional distress sustained by the plaintiff was severe and of a
> nature that no reasonable man could be expected to endure it.

Limone v. United States, 579 F.3d 79, 94 (1st Cir. 2009) (quoting Agis v. Howard Johnson Co.,

371 Mass. 140, 144 (1976)). First, Defendants argue that the Plaintiffs' distress was not "severe"

enough to meet the threshold. Defendants further contend that Defendants' conduct in arresting

Mr. Ciolino "fails to meet the high standard for extreme and outrageous behavior." Plaintiffs

have not specifically responded to these arguments in their Opposition, and it is not clear

whether Plaintiffs intend to pursue their IIED claims at trial. For purposes of this Motion, the

Court will assume that they do.[9]

    After reviewing the record, the Court finds that it is sufficient to withstand summary

judgment as to Plaintiffs' claims of intentional infliction of emotional distress. First, if a jury

were to credit Plaintiffs' version of events, under which the defendant officers applied violent

force to a compliant, non-threatening individual without probable cause, there may be sufficient

evidence to support a finding that defendants' behavior was "extreme and outrageous." See

Eason v. Alexis, 824 F. Supp. 2d 236, 243-44 (D. Mass. 2011) (denying motion for summary

judgment as to IIED claim against arresting police officers, where plaintiff alleged that the

officers "tackled him without cause, threw him over the porch railing, breaking his ankle

severely, pointed a loaded gun at him and filed a criminal complaint against him to cover it all

up"); see also Poy v. Boutselis, 352 F.3d 479, 485 (1st Cir. 2003) (where plaintiff and others

testified that police officer hit him from behind while he was peacefully exiting a building, and

---

[9] Plaintiffs argue in their Opposition that their "common law claims survive," but they refer only
to claims for assault and battery, which are not alleged in their Amended Complaint [ECF No. 66
p. 15].

then pushed him to the ground and handcuffed him without probable cause, there was sufficient evidence to support jury's finding of intentional infliction of emotional distress).

Further, whether Plaintiffs' alleged distress was "severe" enough to give rise to liability is a question that should be resolved by a jury. The summary judgment record contains discovery responses in which Plaintiffs claim to have experienced "feelings of dread and depression" since the incident, in addition to "significant embarrassment and judgment" within the community [ECF Nos. 60-2 & 60-3]. Mr. Ciolino stated that the incident "has caused significant anxiety in my relationship with my wife, in my home, and with my children." [ECF No. 60-3]. Mrs. Ciolino alleges that she felt "anxious, fearful and helpless" while watching her husband's arrest, and that the incident has placed "significant anxiety and stress upon me, my husband, my children, my family, and my marriage." [ECF No. 60-2]. In light of this testimony, and the severity of Mr. Ciolino's alleged physical injuries, Plaintiffs have presented sufficient evidence to withstand summary judgment. See Poy, 352 F.3d at 485-86 (jury could reasonably infer a condition of severe emotional distress based on severity of attack and resulting injuries).

Although Defendants point out that neither Plaintiff sought medical treatment for their alleged emotional distress, medical treatment is not a required element of an IIED claim. In addition, Plaintiffs are not required to present medical evidence for a jury to find that their alleged distress was caused by the Defendants' conduct. See Cady v. Marcella, 49 Mass. App. Ct. 334, 341 (2000) (holding that there was sufficient evidence for a jury to determine plaintiffs' IIED claim, and noting that expert medical testimony is not required to establish a causal connection).

Finally, although Defendants argue that Mrs. Ciolino's IIED claim cannot survive because they had no direct interaction with her, Massachusetts courts have held that it is possible

for "bystander" family members to state a claim for severe emotional distress, if they have

"substantially contemporaneous knowledge of the outrageous conduct" and "a severe emotional

response." Nancy P. v. D'Amato, 401 Mass. 516, 522 (1988). Although Mrs. Ciolino did not

witness the officers taking her husband down to the ground, she did witness the immediate

aftermath, and she observed her husband lying on the ground and restrained by police officers

[Def. Facts ¶¶ 37-38]. This is sufficiently proximate in space and time to be "substantially

contemporaneous" with the incident.

For these reasons, Defendants' Motion for Summary Judgment as to Counts Eight and

Nine is DENIED.

### 5. Count Ten: Massachusetts Civil Rights Act

Count Ten alleges that Defendants "interfered with and deprived Mr. and Mrs. Ciolino"

of their rights under the laws of the Commonwealth of Massachusetts, in violation of the

Massachusetts Civil Rights Act, M.G.L. c. 12, § 11I ("MCRA") [ECF No. 29, ¶¶ 65-66]. The

MCRA was enacted "to provide a State remedy for deprivations of civil rights." Batchelder v.

Allied Stores Corp., 393 Mass. 819, 822 (1985). The Massachusetts Supreme Judicial Court has

noted that although the remedy provided by the MCRA is largely "coextensive" with that

available under 42 U.S.C. § 1983, id., the MCRA's application is far more limited. "To state a

claim under the MCRA, a plaintiff must show that (1) his exercise or enjoyment of rights secured

by the constitution or laws of either the United States or the Commonwealth of Massachusetts

(2) has been interfered with, or attempted to be interfered with, and (3) that the interference or

attempted interference was by threats, intimidation or coercion." Farrah ex rel. Estate of Santana

v. Gondella, 725 F. Supp. 2d 238, 247 (D. Mass. 2010) (citing Swanset Dev. Corp. v. City of

Taunton, 432 Mass. 390, 395 (1996)).

Merely proving the deprivation of a constitutional right will not suffice to establish liability under the MCRA. See Bally v. Northeastern Univ., 403 Mass. 713, 718 (1989). Rather, the Act applies only to situations "where the derogation of secured rights occurs by threats, intimidation or coercion." Id. Courts have held that the added requirement of threats, intimidation or coercion was "specifically intended to limit liability under the Act." Freeman v. Planning Bd. of W. Boylston, 419 Mass. 548, 565-66 (1995); see also Bally, 403 Mass. at 718 (noting that the Massachusetts Legislature "did not intend to create a vast constitutional tort" in enacting the MCRA) (quoting Bell v. Mazza, 394 Mass. 176, 182-83 (1985)). Thus, a "direct violation" a person's constitutional rights, without threats, coercion, or intimidation, "does not implicate the Act." Longval v. Commissioner of Correction, 404 Mass. 325, 333 (1989). Rather, MCRA liability arises only when "(1) the defendant threatens, intimidates, or coerces the plaintiff, in order to (2) cause the plaintiff to give up something that the plaintiff has the constitutional right to do." Goddard, 629 F. Supp. 2d at 128.

Defendants argue that they are entitled to summary judgment on Count Ten, because the record contains no evidence suggesting that they attempted to coerce, threaten, or intimidate Plaintiffs into relinquishing any protected rights. The majority of courts have held that in cases involving wrongful arrests or excessive force, the fact of a Fourth Amendment violation, standing alone, does not give rise to a claim under the MCRA. See Bettencourt, 2012 WL 5398475, at *13 (allowing summary judgment for defendant officer, and holding that officer's conduct in grabbing and pepper-spraying the plaintiff, even if it amounted an illegal seizure or excessive force, was insufficient to establish liability under the MCRA); Santiago v. Keyes, 890 F. Supp. 2d 149, 156 (D. Mass. 2012) (dismissing MCRA claims against police officers who arrested plaintiff at a traffic stop, holding that plaintiff could not "rely on the arrest as both the

constitutional violation and the evidence of threats, intimidation, or coercion") <u>Titus</u>, 840 F.

Supp. 2d at 416 (allowing summary judgment for defendant on MCRA claim); <u>Farrah</u>, 725 F.

Supp. 2d at 248 (same); <u>Goddard</u>, 629 F. Supp. 2d at 129 (same); <u>see also</u> <u>Orwat v. Maloney</u>,

360 F. Supp. 2d 146, 164 (D. Mass. 2005) (allowing summary judgment for defendant on

plaintiff prisoner's MCRA claim for excessive force in violation of his Eighth Amendment

rights).[10]

 "The use of force is not, in itself, 'coercive' within the meaning of the [MCRA] unless

such force is inflicted in order to achieve 'some further purpose.'" <u>Gallagher v. Commonwealth</u>

<u>of Massachusetts</u>, No. CIV.A. 00-11859-RWZ, 2002 WL 924243, at *3 (D. Mass. Mar. 11,

2002) (quoting <u>Longval</u>, 404 Mass. at 333). To hold otherwise would "graft one act onto two

distinct burdens," <u>Santiago</u>, 890 F. Supp. 2d at 156, which would be at odds with legislative

intent. <u>See also</u> <u>Longval</u>, 404 Mass. at 333 (noting that generally, coercion does not arise "simply

from the use of force by prison officials, authorized to use force, in order to compel a prisoner to

do something he would not willingly do, even if it turns out that the official had no lawful right

to compel the prisoner to take that action"); <u>Goddard</u>, 629 F. Supp. 2d at 129 (concluding that it

be nonsensical to find that police officers "assaulted the plaintiff in order to cause the plaintiff to

give up his right to be free from excessive force").

 Therefore, to survive Defendants' Motion for Summary Judgment, Plaintiffs would need

to come forth with some evidence that Defendants falsely arrested and/or allegedly assaulted Mr.

Ciolino with the intent to achieve "some further purpose" of violating one or more of Plaintiffs'

rights, beyond Mr. Ciolino's Fourth Amendment right to be free from unlawful searches or

---

[10] <u>But see</u> <u>Nuon v. City of Lowell</u>, 768 F. Supp. 2d 323, 335 n.8 (D. Mass. 2011) (holding that arrest without probable cause establishes the "coercion" element for purposes of the MCRA).

seizures. <u>See</u>, <u>e.g.</u>, <u>Sarvis v. Boston Safe Deposit & Trust Co.</u>, 47 Mass. App. Ct. 86, 92-93

(affirming judgment for plaintiffs on MCRA claim, where plaintiffs were arrested as part of

defendants' attempt to interfere with their statutory rights to a summary process hearing prior to

eviction). Here, however, Plaintiffs have not pointed to any such evidence of ulterior motive.

Consequently, Defendants are entitled to judgment as a matter of law on Count Ten. <u>See, e.g.</u>,

<u>Farrah</u>, 725 F. Supp. 2d at 248 (summary judgment was appropriate, where plaintiff failed to

produce any evidence that he was arrested with the intent to coerce him into refraining from the

exercise of a right or privilege secured by law).

## IV.    CONCLUSION

For the foregoing reasons, the Court makes the following rulings on Defendants' Motion

for Summary Judgment [ECF No. 58]:

1.  Defendants' Motion is <u>ALLOWED</u> in full with respect to all claims asserted against

defendant Cousins, and judgment for Cousins shall enter on Counts Two, Four, and Ten.

2. With respect to Defendants Gikas, Earle, and Eastman, Defendants' Motion for Summary

Judgment is <u>DENIED</u> as to Count One of the Amended Complaint, and the Court will postpone

ruling on the qualified immunity question until after trial. Defendants' Motion for Summary

Judgment is <u>DENIED</u> with respect to Counts Four, Six, Eight, and Nine of the Amended

Complaint. Defendants' Motion for Summary Judgment is <u>ALLOWED</u> as to Count Ten of the

Amended Complaint.

**SO ORDERED.**

Dated: September 3, 2015                             /s/ Allison D. Burroughs
                                                    ALLISON D. BURROUGHS
                                                    DISTRICT JUDGE