UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| CINSIA CIOLINO and ALFONSO CIOLINO, | * | |
| | * | |
| Plaintiffs, | * | |
| | * | |
| v. | * | No. 13-cv-13300-ADB |
| | * | |
| AARON EASTMAN, et al., | * | |
| | * | |
| Defendants. | * | |

**MEMORANDUM & ORDER**
**ON DEFENDANT'S MOTION FOR JUDGMENT AS A MATTER OF LAW**

BURROUGHS, D.J.

This civil action involves claims of excessive force during an arrest. After a jury trial, one of the arresting officers – George Gikas – was found liable under 42 U.S.C. § 1983. Presently before the Court is Gikas' post-trial motion for judgment as a matter of law, on the grounds of qualified immunity. [ECF No. 129]. For the reasons set forth in this Memorandum and Order, the motion is DENIED.

I.     BACKGROUND

On the evening of June 30, 2013, while attending the annual St. Peter's street festival in Gloucester, Massachusetts, Plaintiff Alfonso Ciolino ("Plaintiff") was arrested by officers of the Essex County Sheriff's Department. Plaintiff, whose rotator cuff was torn during the arrest, later filed this civil action against the arresting officers – Defendants Aaron Eastman, David Earle, and George Gikas. In Count I of his First Amended Complaint, [ECF No. 29], Plaintiff asserted a claim under 42 U.S.C. § 1983, alleging that Defendants used excessive force in violation of Plaintiff's Fourth Amendment rights. In Count VI, Plaintiff asserted a state-law claim for

1

malicious prosecution, alleging that the Defendants conspired to provide false information to the

Gloucester Police Department, resulting in the filing of criminal charges against Plaintiff.[1]

After discovery, Defendants moved for summary judgment on Plaintiff's § 1983

excessive force claim, arguing that they were entitled to qualified immunity. The Court denied

the motion, holding that it would defer ruling on the qualified immunity issue until after trial,

because certain critical facts remained in dispute. [ECF No. 68].

Trial began on January 19, 2016 and concluded with a jury verdict on January 25, 2016.

On the malicious prosecution claim, the jury found in favor of Defendants. With respect to the §

1983 excessive force claim, the jury found that only Gikas was liable and awarded Plaintiff

$140,000 in damages. Defendants Eastman and Earle were found not liable under § 1983. The

jury also answered several special questions posed by the Court, which were designed to assist

the Court in deciding the qualified immunity issue.[2]

Gikas moves for judgment as a matter of law on Count I, on the grounds that he is

qualifiedly immune from suit. Defendants timely made their motion after Plaintiff rested [ECF

No. 123], and Sergeant Gikas renewed the motion after the jury verdict. [ECF No. 129]; see Fed.

R. Civ. P. 50. The parties also submitted post-trial memoranda on this issue.  [ECF Nos. 130,

132, 133, 134].

---

[1] Other counts of the First Amended Complaint were dismissed on summary judgment, or dismissed voluntarily prior to trial.

[2] See St. Hilaire v. City of Laconia, 71 F.3d 20, 24 n.1 (1st Cir. 1995) (noting that while qualified immunity is a question of law, "[s]ome courts, consonant with the Seventh Amendment, have preserved the fact finding function of the jury through special interrogatories to the jury as to the disputes of fact, reserving the ultimate law question to the judge"); Singh v. Blue Cross/Blue Shield of Massachusetts, Inc., 308 F.3d 25, 34 n.9 (1st Cir. 2002) (expressing approval of the practice).

## II.      FACTS

When deciding the issue of qualified immunity after a jury verdict, "the evidence must be construed in the light most hospitable to the party that prevailed at trial," and "deference should be accorded to the jury's discernible resolution of disputed factual issues." Jarrett v. Town of Yarmouth, 331 F.3d 140, 147 (1st Cir. 2003) (internal quotations omitted) (quoting Iacobucci v. Boulter, 193 F.3d 14, 23 (1st Cir.1999)).  Therefore, the Court construes the facts in the light most favorable to the Plaintiff and the verdict.

On the evening of June 30, 2013, Plaintiff and his wife, Cinsia Ciolino ("Mrs. Ciolino") and two other couples, (the LoGrassos and the Giordanos) went to a barbeque at Mrs. Ciolino's mother's residence. At approximately 10:00 p.m., they departed the barbeque and drove to downtown Gloucester to go to the annual St. Peter's street festival. After arriving downtown, the three couples went to a local bar and restaurant called Captain Carlo's, then to another restaurant called Café Sicilia, and finally to the St. Peter's Club on Main Street. Plaintiff testified that over the course of the evening, he consumed one to two beers, but was not intoxicated when he left the St. Peter's Club.

When Plaintiff exited the St. Peter's Club at approximately midnight, there was a small crowd gathered outside the club. Law enforcement officers and K-9 dogs from the Essex County Sheriff's Department and the Gloucester Police Department were stationed outside the club to perform crowd control. Defendant George Gikas, a Sergeant of the Essex County Sheriff's Department, was assigned to K-9 duty that evening. Defendants Eastman and Earle, who are also Officers employed by the Essex County Sheriff, were assigned to plainclothes duty.

Around the time that Plaintiff exited the club onto Main Street, or shortly thereafter, law enforcement officers gave the crowd orders to disperse and clear the area. Video footage of the incident, which was admitted into evidence at trial, revealed that some people in the crowd were

moving along the sidewalk, but some remained immobile. Sergeant Gikas stood in the street with his K-9 dog, facing the crowd, approximately six feet away from the sidewalk. Another K-9 officer, identified as Sergeant Pickles, was standing with his own K-9 dog, in front of Sergeant Gikas, and in closer proximity to the sidewalk. Officers Eastman and Earle stood in the street behind Sergeant Gikas, also facing the crowd. Both K-9 dogs were barking continuously in the direction of the crowd.

After leaving the St. Peter's Club, Plaintiff walked into the area where the crowd was gathered, and then took several steps down the sidewalk, towards Sergeant Gikas and Sergeant Pickles. He paused in front of Sergeant Pickles' K9 and briefly lifted his arm, which came within two feet of the dog's head. Plaintiff testified that while making this gesture, he also made a statement to the effect of "look, the dog's got a muzzle in its mouth. What's he going to do? The dogs can't hurt us . . . they have muzzles on." Plaintiff then turned around and faced the opposite direction, with his back towards the officers. Sergeant Pickles did not immediately react. Sergeant Gikas, however, who was standing behind Sergeant Pickles, took several steps towards the sidewalk, grabbed Plaintiff by the shirt collar, and, with one hand, forcibly pulled Plaintiff's body backwards into the street and down onto the pavement. Plaintiff fell on his right arm, which resulted in an injury to his rotator cuff. As he fell, Officers Eastman and Earle approached, and each took hold of one of Plaintiff's arms. Officers Eastman and Earle then pushed Plaintiff onto his stomach and placed Plaintiff in handcuffs. The video ends with Plaintiff lying face-down on the pavement.  Officer Gikas testified that prior to approaching Plaintiff, he had observed Plaintiff repeatedly taunt the dogs and then turn to incite the crowd, and that he was not going to allow this disruptive conduct to continue while they the officers were trying to disperse the crowd at the end of the festival.

4

After his arrest, Plaintiff was transported to the Gloucester Police Department and charged with a municipal ordinance violation and disorderly conduct. Those charges, however, were subsequently dismissed by the Gloucester District Court.

Included in the jury verdict form were four special questions, intended to assist the Court in making its post-trial decision on qualified immunity. The Court instructed the jury to answer these four special questions only if they found any one of the Defendants to have used excessive force. The four questions posed to the jury were as follows:

    a.  Did Mr. Ciolino fail to comply with any orders from law enforcement officers immediately prior to the arrest? Check One: Yes_____ No_____

    b.  Did the Defendants have probable cause to arrest Mr. Ciolino on the night in question? Check One: Yes_____ No_____

    c.  Was Mr. Ciolino taunting or inciting any of K9 dogs immediately prior to his arrest? Check One: Yes_____ No_____

    d.  Was Mr. Ciolino inciting the surrounding crowd immediately prior to his arrest? Check One: Yes_____ No_____

On January 25, 2016, while the jury was deliberating, the jury sent the Court a note requesting further instructions on special question (d). Specifically, the jury asked "does the meaning of the word inciting mean that the Plaintiff had to attempt to incite the crowd or succeed in inciting it?" After discussion with counsel, the Court decided that it would not define the word "inciting" for the jury because no such definition had been given during jury instructions. Instead, the Court instructed the jury that the special questions required unanimous agreement, and if they could not come to agreement on a particular question, then that question was to be

left unanswered. The jury returned its verdict later that day. Questions (a), (b), and (c) were all answered "Yes," and question (d) was left blank.

## III.   LEGAL STANDARD

"The doctrine of qualified immunity protects government officials 'from liability for civil damages insofar as their conduct does not violate clearly established statutory or constitutional rights of which a reasonable person would have known.'" Pearson v. Callahan, 555 U.S. 223, 231 (2009) (quoting Harlow v. Fitzgerald, 457 U.S. 800, 818 (1982)). "Qualified immunity balances two important interests—the need to hold public officials accountable when they exercise power irresponsibly and the need to shield officials from harassment, distraction, and liability when they perform their duties reasonably." Id.

To determine whether qualified immunity applies in a given case, it is necessary to determine "(1) whether a public official has violated a plaintiff's constitutionally protected right; and (2) whether the particular right that the official has violated was clearly established at the time of the violation." Raiche v. Pietroski, 623 F.3d 30, 35 (1st Cir. 2010). Although the two prongs of the analysis "need not be considered in any particular order . . . both prongs must be satisfied for a plaintiff to overcome a qualified immunity defense." Id.

Here, the jury has already determined that Gikas violated Plaintiff's Fourth Amendment rights by using excessive force during Plaintiff's arrest. Gikas, moreover, does not challenge the sufficiency of the evidence to support the jury's findings on this point. Thus, given the jury verdict, all that remains of the qualified immunity analysis is to determine whether Plaintiff's constitutional right to be free from such force was "clearly established" at the time of the violation or, in other words, whether the officer should have understood his actions to be violative of Plaintiff's rights.  This is a question of law for the Court to decide. St. Hilaire v. City of Laconia, 71 F.3d 20, 24 (1st Cir. 1995).

In conducting this analysis, the Court must consider both "the clarity of the law in general at the time of the alleged violation," and "the clarity of the law as applied to the case – in other words, whether a reasonable person in the defendant's shoes 'would have understood that his conduct violated the Plaintiff['s] constitutional rights.'" Raiche, 623 F.3d at 35-36 (quoting Maldonado v. Fontanes, 568 F.3d 263, 269 (1st Cir. 2009)). The Supreme Court recently cautioned that "clearly established law" should not be defined at a "high level of generality," and that the "dispositive question is 'whether the violative nature of the *particular* conduct is clearly established.'" Mullinex v. Luna, 136 S. Ct. 305, 308 (2015) (emphasis in original) (quoting Ashcroft v. al-Kidd, 563 U.S. 731, 742 (2011)). The Court noted that this specificity

> is especially important in the Fourth Amendment context, where … "it is sometimes difficult for an officer to determine how the relevant legal doctrine, here excessive force, will apply to the factual situation the officer confronts."

Id. (quoting Saucier v. Katz, 533 U.S. 194, 205 (2001)).

## IV.    ANALYSIS

At the time of the incident, it was well-established that the use of excessive force during an arrest violates an individual's Fourth Amendment rights. The Supreme Court set forth the governing principles in Graham v. Connor, 490 U.S. 386 (1989), and there is ample First Circuit authority interpreting and applying those principles in excessive force cases. The more difficult question is whether it was clearly established, prior to the incident, that the force used by Sergeant Gikas would be excessive "in the situation [he] confronted." Stamps v. Town of Framingham, 813 F.3d 27, 39 (1st Cir. 2016) (quoting Mullinex, 136 S. Ct. at 309) (alteration added) (internal quotations omitted). In other words, viewing the facts in the light most favorable to the Plaintiff and consistent with the jury's verdict, was it clearly established that using such force in such factual circumstances violated a person's Fourth Amendment rights?

7

The issue of qualified immunity in this case is a very close call. Law enforcement officers have difficult jobs, and an argument could be made that in close cases, their decisions should not be second-guessed. The Court has also seriously considered Sergeant Gikas' own uncontroverted testimony that, prior to this incident, in his twenty years of service with the Sheriff's Department, he had never before used force in a crowd-control situation.  This suggests that he does not typically overreact in similar situations.

On the other hand, the jury found that the force used by Sergeant Gikas was excessive, despite also finding that (1) there was probable cause to arrest Plaintiff; (2) Plaintiff disobeyed orders from law enforcement; and (3) Plaintiff was taunting a K9 police dog. Although the issue of qualified immunity is a question of law, the Court has given careful consideration to the jury's findings on these issues. The jury's verdict, together with its responses to the special questions, suggests that while there may have been probable cause to arrest Plaintiff for disorderly conduct, the force Gikas used was excessive because Plaintiff posed no immediate threat to the safety of the crowd, the officers, or the K9 dogs.

Furthermore, the video evidence clearly established that Sergeant Pickles was standing closer to Plaintiff than Sergeant Gikas, and that although Plaintiff gestured towards Sergeant Pickles' K9 dog, Sergeant Pickles did not appear to react to Plaintiff at all. This suggests that Plaintiff's actions were not disruptive enough to cause another K9 officer any alarm, much less a level of alarm that would warrant the use of force.

The Court has also considered the nature and severity of the offense for which Plaintiff was arrested. Disorderly conduct can encompass a range of conduct, but in this case, Plaintiff did not use or threaten violence, nor was he inciting the crowd to act violently. Moreover, Plaintiff made no attempt to evade arrest or cause any further disturbance. Although Plaintiff's refusal to

obey orders to disperse, coupled with his taunting of the K9 dog, might have provided probable

cause to arrest him for disorderly conduct, there was no evidence that making that arrest required

any force whatsoever.

After surveying the governing precedent, and recognizing that the Supreme Court has not

required "a case directly on point," <u>Mullenix</u>, 136 S.Ct. at 308, the Court concludes that, at the

time of the incident on June 30, 2013, it was clearly established that forcibly throwing a suspect

to the ground for purposes of making an arrest would constitute excessive force, if the person

was suspected of a relatively minor crime, posed no immediate threat to the safety of the public

or the officer, and was not otherwise attempting to flee or evade arrest. <u>See</u> <u>Raiche</u>, 623 F.3d at

39 (during a routine traffic stop for plaintiff's failure to wear a helmet on a motorcycle, "[a]n

objectively reasonable police officer would have believed that tackling [plaintiff] from his

motorcycle and slamming him into the pavement would violate his constitutional right to be free

from excessive force"); <u>Morelli v. Webster</u>, 552 F.3d 12, 24 (1st Cir. 2009) (qualified immunity

would be unavailable where the facts, "seen through the prism of the plaintiff's account, simply

do not justify yanking the arm of an unarmed and non-violent person, suspected only of the theft

of $20, and pinning her against a wall for three to four minutes with sufficient force to tear her

rotator cuff"); <u>Alexis v. McDonald's Rests. of Mass., Inc.</u>, 67 F.3d 341, 346, 353 (1st Cir. 1995)

(reversing summary judgment for defendant, where there was evidence that officer "suddenly

and violently grabbed and pulled [plaintiff's] body from the booth and across the table," and

there was "no evidence or suggestion that [plaintiff] posed a risk of flight, attempted to resist or

evade arrest, or threatened the peace, property, or safety of anyone"); <u>see also</u> <u>Goddard v. Kelley</u>,

629 F. Supp. 2d 115, 128 (D. Mass. 2009) ("The use of violence against individuals who pose no

safety threat is clearly unreasonable, and that fact would have been understood by an objectively

reasonable officer."); <u>Barber v. Guay</u>, 910 F. Supp. 790, 800-01 (D. Me. 1995) (denying officer's qualified immunity defense, where suspect "posed no threat; [ ] didn't resist arrest, or attempt to flee," and had not committed "a particularly severe or violent criminal act"); <u>Smith v. Jackson</u>, 463 F. Supp. 2d 72, 80 (D. Me. 2006) ("Reasonable officers would have understood that slamming an intoxicated and non-resistant man's face into a concrete walkway while effecting an arrest constitutes excessive force . . . .").

The only possible wrinkle in this analysis might be if an officer had a well-founded belief that the crowd was volatile enough that he would be justified in using force to quickly defuse the situation before violence ensued, even assuming no resistance, flight or the commission of a serious offense. In this case, however, the crowd outside the St. Peter's Club was not on the precipice of violence, nor was the atmosphere combustible enough for Plaintiff's actions to ignite lawlessness. Although there was some testimony that it was late at night and that the crowd had been drinking throughout the evening, the evidence, considered in the light most favorable to the verdict, did not suggest that Officer Gikas or any of the other officers believed it was a rapidly escalating situation that could result in imminent danger to themselves or festival participants if they did not use force to quickly subdue the Plaintiff.

Therefore, in light of precedent and the situation before him, a reasonable officer in Sergeant Gikas' position would have understood that throwing Plaintiff to the pavement in those circumstances was unnecessary, and would thus violate his Fourth Amendment right to be free from excessive force. Accordingly, Sergeant Gikas is not entitled to qualified immunity on Count I.[3]

---

[3] Here, the Court views the facts in a manner that harmonizes the jury's verdict with its responses to the special questions. Although Plaintiff objected to the special questions at trial, the Court

**V.      CONCLUSION**

For the foregoing reasons, Defendant Gikas' Motion for Judgment Notwithstanding the

Verdict [ECF No. 129] is <u>DENIED</u>.

**SO ORDERED.**

Dated: August 4, 2016                                    /s/ Allison D. Burroughs
                                                         ALLISON D. BURROUGHS
                                                         U.S. DISTRICT JUDGE

---

notes that the outcome of the qualified immunity issue would have been the same if the special
questions had not been posed.